UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DAVID A. SCOTT, Jr., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:14-CV-106 JD |
| | ) |
| UAW SOLIDARITY HOUSE b/k/a | ) |
| INTERNATIONAL UNION, UNITED | ) |
| AUTOMOBILE, AEROSPACE and | ) |
| AGRRICULTURAL IMPLEMENT | ) |
| WORKERS OF AMERICA, UAW, | |
| | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff David A. Scott, Jr., filed the instant lawsuit *pro se*, alleging that his union representatives: (1) engaged in sexual discrimination by advocating for female union members over him; (2) violated the Americans with Disability Act (the "ADA") by allowing his employer to ignore his physical work restrictions; (3) retaliated against him when he complained by not pursuing his grievances; and (4) failed to fairly represent him after his termination.[1] Scott originally named his union, along with several individual defendants in this action. The Court previously dismissed the individuals in accordance with Fed. R. Civ. P. 41(a)(2) [DE 44], leaving only UAW Solidarity House (the "Union") as the defendant.[2]

---

[1] Scott uses the term "wrongful termination" in his complaint, but in doing so describes a cause of action against the Union for breach of the duty of fair representation under the Labor Management Relations Act, 29 U.S.C. § 185. [DE 1 at 4] The Court will construe his claim as one for breach of the Union's duty to provide fair representation after Lear terminated him.

[2] The Union requests a ruling that it, as the "International Union," is the only defendant in this case. [DE 99 at 14-15] Scott did not serve the Union's local affiliate, "Local 2335," in this lawsuit, but raises several allegations against Local 2335 in his complaint and in his deposition testimony. The Court declines to parse the allegations and the record in order to analyze this request; the defendant's argument, even if well-taken, matters little since the substance of Scott's claims do not withstand summary judgment for the

Scott brought a parallel action in this District against his employer, Lear Corporation, and the Court consolidated these cases for discovery purposes only.[3] [DE 26] Discovery has now closed and the Union moved for summary judgment. [DE 96] The Union also moved to strike Scott's response to its summary judgment motion based on numerous deficiencies. [DE 104] For the reasons stated herein, the Court will grant both the Union's Motion to Strike and its Motion for Summary Judgment.

## DISCUSSION

I. **Defendant's Motion to Strike**

Scott's response to Defendant's motion for summary judgment can be divided into two parts: a six page brief that reads more like an affidavit;[4] and over 200 pages of documents – mostly phone bill records – labeled as "exhibits." Defendant moved to strike Scott's response [DE 105], and Scott filed nothing in opposition.

The response to Defendant's motion for summary judgment, as a whole, does not comply with Fed. R. Civ. P. 56. For example, Scott has failed to authenticate or identify the documents

---

reasons stated herein. The Court will include Local 2335's actions when it refers to "the Union," where applicable.

[3] The parallel action is Case No. 2:14-cv-107 before Judge Lozano. On September 27, 2017, Judge Lozano granted Lear's motion for summary judgment and dismissed Scott's claims with prejudice.

[4] Even if considered an affidavit, Scott's brief would be stricken for failing to comply with Fed. R. Civ. P 56(c)(4) because it does not maintain that it is based on personal knowledge, set out admissible facts, or show that Scott is competent to testify on the matters discussed within. On summary judgment, affidavits are only admissible under 28 U.S.C. § 1746 if they are "made under penalties of perjury; only unsworn documents purporting to be affidavits may be rejected." *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). Because Scott makes no mention that his statements are subscribed by him as true under penalty of perjury, the Court would not be able to consider his filing as an admissible affidavit. *See Sexson v. State Farm Fire & Cas. Co.*, 61 F. App'x 267, 270 (7th Cir. 2003) ("On a motion for summary judgment, a court *must not* consider those parts of an affidavit that are insufficient" under Fed. R. Civ. P. 56(c)(4), which sets out mandatory requirements "and the failure to follow those requirements makes the proposed evidence inadmissible during the consideration of a summary judgment motion.") (internal citations omitted).

attached to his brief, despite the requirement that "[w]hen evidence is offered through exhibits on a summary judgment motion, those exhibits 'must be identified by affidavit or otherwise be admissible.'" *Sissom v. Purdue Univ.*, No. 4:04-CV-72, 2006 WL 897572, at *4 (N.D. Ind. Mar. 31, 2006), *aff'd*, 207 F. App'x 715 (7th Cir. 2006) (quoting *Powers v. Dole*, 782 F.2d 689, 696 (7th Cir. 1986)). But even if Scott had properly authenticated his exhibits, he fails to provide *any* citations in his brief that would otherwise guide the Court to the specific documents he believes demonstrate the existence of material issues of fact. While Scott's narrative references letters and phone call records in passing, he makes only a single catch-all link to the documents he attached:

> Plaintiff will include EXHIBITS A, B, C, D & 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 to show how the defendant UAW was involved with helping Lear carry out all of their bad acts and not trying or attempting to represent plaintiff fairly by allowing Lear and the UAW to violate the plaintiffs [sic] CBA contract rights.

[DE 103 at 5] Scott therefore has failed to support his factual positions in accordance with Fed. R. Civ. P. 56(c)(1), and the Court need not sift through these several hundred pages of documents, pluck out the ones that Scott *might* be referring to in his brief, and then reconstruct his response by stitching them to various points in his narrative. *Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013) ("[A] district court is not required to scour the record looking for factual disputes or to scour the party's various submissions to piece together appropriate arguments. A court need not make the lawyer's case.").

True, Scott's pro se status generally requires the Court to afford his pleadings a more liberal construction. *Kaba v. Stepp*, 458 F.3d 678, 687 (7th Cir. 2006). "However, it is also well established that pro se litigants are not excused from compliance with procedural rules." *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (citing *McNeil v. United States*, 508 U.S. 106, 113, 113 S. Ct. 1980, 124 L. Ed. 2d 21 (1993) (noting that the Supreme Court has "never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse

3

mistakes by those who proceed without counsel")). A lawsuit "is not a game of hunt the peanut." *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 727 (7th Cir. 2001). Employment discrimination claims and labor disputes in particular are extremely fact-intensive in nature, and the Court is not "obliged in our adversary system to scour the record looking for factual disputes …." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1993); *see also Greer*, 267 F.3d at 727 (noting that district court would have been within its right to grant summary judgment against *pro se* plaintiff in employment discrimination case where plaintiff's response did not cite evidence in support and contained self-serving legal conclusions).

Here, Defendant notified Scott about its motion for summary judgment, as required by L.R. 56-1(f). [DE 97] Defendant's notice not only included copies of the federal and local rules governing summary judgment, but also provided Scott with a straightforward warning that failure to follow these rules may result in him losing this case. *Id.* Scott did not heed this advice and filed a noncompliant response to Defendant's motion for summary judgment, containing the various deficiencies as discussed above. Although Scott is a *pro se* litigant, "'strict adherence to the procedural requirements … is the best guarantee of evenhanded administration of the law.'" *McNeil*, 113 S. Ct. at 1984; (quoting *Mohasco Corp. v. Silver*, 100 S. Ct. 2486, 2497 (1989)). Thus, the Court will grant Defendant's motion to strike Scott's response in its entirety, including the documents attached thereto. *Rosemary B. on Behalf of Michael B. v. Bd. of Educ. of Cmty. High Sch. Dist. No. 155*, 52 F.3d 156, 158-59 (7th Cir. 1995) (affirming district court's decision to strike plaintiff's response that included no references to supporting evidence and attached unauthenticated documents); *see also Sissom*, 2006 WL 897572, at **4-6 (striking plaintiff's response to motion for summary judgment that was unsupported by authenticated evidence and

contained no citations or "any sort of guide by which to navigate the maze of evidentiary submissions") (internal citations omitted).

## II. Defendant's Motion for Summary Judgment

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008); *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999).

## FACTUAL BACKGROUND

Because of the deficiencies in Scott's response, the Court resolves the present motion for summary judgment on the facts properly before it, meaning almost entirely those supplied by the Union. The following undisputed facts will be accepted as true:

Lear operates a plant in Hammond, Indiana, that manufactures seats for Ford vehicles. Lear employed Scott at the Hammond facility from October 2010 to April 23, 2013, and initially hired him to work on the production line as an assembler. The Union represents over 700

5

employees at the Hammond plant, and a collective bargaining agreement outlined and governed the terms and conditions of employment, including a grievance process, for bargaining unit employees from September 12, 2009, through August 4, 2014 (the "CBA"). Scott was a member of the Union while employed at the facility.

Scott claims he experienced an assortment of problems at Lear between December 2010 and December 2011. However, he sought assistance from the Union with regard to only a few of those issues, such as vacation day credits, unpaid wages, worker's compensation claims, and sexual harassment. Union officials indeed responded in the affirmative to Scott's requests for help. On December 20, 2011, Scott began a leave of absence for issues he had with his feet.

Because he felt the Union was inadequately prosecuting grievances he never asked to be filed, Scott wrote to former International Union President Bob King in January 2012. On January 26, 2012, Scott filed a National Labor Relations Board ("NLRB") unfair labor practice charge against Local 2335, alleging that the Union breached its duty of fair representation by failing to process his grievances for discriminatory, arbitrary, and capricious reasons. On March 13, 2012, the NLRB regional office dismissed Scott's charge due to insufficient evidence. Scott appealed that dismissal, but the national office denied his challenge because its investigation revealed that the Union indeed looked into and resolved his complaints.

Scott returned to work at the Hammond facility on August 29, 2012. The following day, he hurt himself while loosening leather and affixing it to seat headrests. Subsequent to this injury, Scott did not work at all in September or October 2012.

By the time he returned to work in November 2012, Scott had been placed on various work restrictions involving the use of his right arm by his then-physician, Dr. Schwartz. Lear contacted Scott to inform him that it could accommodate him by assigning tasks that conformed

6

to his work restrictions. As scheduled, Scott returned to work on November 13, 2012. During the month of November 2012, Scott worked about 3 or 4 hours each day on November 13, 14, 15, 19, 20, 21, 26, and 27. Between November 13 and 15, Scott sat by himself in the cafeteria. Between November 19 and 21, Scott wiped cafeteria tables. On November 26 and 27, he separated and sorted bolts. November 27, 2012, marked the last day Scott worked at Lear's facility. Thereafter, he reported as "sick."

After Scott stopped reporting for work, Lear reached out to him on multiple occasions in November and December 2012 to inform him that it had suitable work within his physical restrictions. Scott did not take up Lear's offer, and failed to provide Lear with required medical documentation regarding additional work restrictions from his new physician until April 2013. Lear terminated Scott on April 23, 2013.

Immediately following his termination, the Union filed a grievance with Lear on Scott's behalf. The Union navigated his grievance through the multi-step process as set forth in the CBA, but Lear would not reinstate Scott. Finally, the matter proceeded to binding mediation on March 17, 2014. Scott prepared for and participated in the mediation along with Union officials. The mediator ruled against Scott, finding that Lear terminated him for just cause, but the Union still managed to negotiate a modest settlement offer from Lear. Scott rejected that offer. In light of these events and in keeping with the binding nature of the mediation, the Union informed Scott on April 8, 2014, that it would take no further action on his grievance.

# ANALYSIS

### a. Scott's Title VII and ADA Claims are Limited to Events that Occurred On or After November 8, 2012

In Indiana, an EEOC charge "must be filed within 300 days of the occurrence of the act that is the basis of the complaint." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994). Scott filed his EEOC charge against the Union for discrimination based on sex, disability, and retaliation, on September 4, 2013. [DE 1 at 6] Thus, his Title VII and ADA claims are limited to those based on events occurring on or after November 8, 2012.

### b. Scott's Sex Discrimination Claims Fail

Title VII prohibits labor organizations from discriminating against any individual because of his race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(c)(1). To prevail on his sex discrimination claim, Scott must demonstrate a causal link between his gender and an adverse action. The legal standard to be applied "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*

Scott's sex discrimination claim is one sentence: "Sex discrimination because the union [steward] would only represent the females." [DE 1 at 3] Although his complaint does not set forth the basis for his sex discrimination claim, Scott testified to a few examples in which Union representatives filed grievances on behalf of female employees. For example, Scott claims that a female employee named "Charmaine" had her grievance processed by the union representatives,

but he could not provide any details about that grievance, such as its subject matter, resolution, or whether it was even filed. [DE 98-15 at 199:8-200:7] Scott also claimed that union officials represented one or two unnamed female employees who had been disciplined for abusing the punch-in clock, but again, Scott could not provide any evidence as to whether the Union actually processed those grievances. *Id.* at 200:10-201:13. Critically, Scott has not identified a single grievance he wanted pursued that got passed up in favor of these female workers' grievances, and so, there can be no disparate treatment.[5] And regardless, these episodes both occurred in 2011, *id.* at 200:8-9, 201:14-15, well more than 300 days prior to his EEOC filing in September 2013. Therefore, his sex discrimination claim is time barred.

Moreover, to survive summary judgment, Scott must present evidence that would allow a reasonable jury to find that the Union allegedly declined to represent his interests while at Lear *because of* his sex. He has not done so here, notwithstanding his failure to identify any of his own grievances that went unprosecuted. In fact, by his own sworn testimony, the union officials did indeed represent other males:

> Q. Do you contend that [the union] represented other males?
> A. Males that were part of the – you know, their little group, yeah.
> Q. And that would be – that would be other co-workers of yours, correct?
> A. Correct.

*Id.* at 199:1-7. No reasonable factfinder could draw a causal connection between Scott's gender and the union representatives' alleged adverse action, and his claim of sex discrimination must therefore fail.

---

[5] Even if Scott had pointed to the grievance he claimed to have requested after being sexually harassed by a female coworker as an example of his claims being passed over for those of his female coworkers, his sex discrimination claim would still fall flat because of his failure to show that the Union passed this grievance over because of his sex.

### c. Scott's ADA Claim Fails

Scott alleges that "the union [steward] took part in allowing the company to violate [his] disability and work restrictions to cause more harm and denial of medical treatment." [DE 1 at 3] More specifically, he claims the Union failed to file grievances to have him removed from the jobs that Lear assigned him to and that he believes fell outside his work restrictions. [DE 98-15 at 221:16-21]

Under the ADA, employers and labor organizations shall not "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The ADA states that "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee" is considered discrimination, "unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). "To establish a claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (citation omitted).

Regarding his ADA claim, Scott does not maintain that he lived with any disability apart from his injury-related work restrictions. Around late 2011 and early 2012, his then-physician, Dr. Schwartz, placed him on a permanent restriction limiting him to "light physical demand" and "20 pounds of occasional lifting, 10 pounds of frequent lifting, and negligible constant lifting." [DE 98-14 at 1] Related to these restrictions, the physician diagnosed Scott with a 7% upper extremity impairment. *Id.* The record also indicates that Dr. Schwartz cleared Scott to return to work with no use of his right arm after his August 2012 injury. [DE 98-13 at 116-123, 166]

But it matters not whether these work restrictions made Scott a qualified individual with a disability under the ADA because his employer did not fail to reasonably accommodate his limitations. After injuring himself at the end of August 2012, Scott did not work at Lear either in September or October. [DE 98-13 at 109:9-11, 116:9-15] On November 12, 2012, Lear advised Scott that it could accommodate the restrictions prescribed by Dr. Schwartz. [DE 98-14 at 2] Scott returned to work the following day and worked a total of eight days at Lear over the course of that November, for about three or four hours each day. *Id.* at 125:20-21, 127:14-17, 128:7-9. During that time, Lear indeed accommodated his restrictions by having him sit in the cafeteria, wipe tables, and sort bolts. *Id.* at 127:3-129:20. Scott got paid for the time he worked in November 2012. *Id.* at 128:13-15. He stopped reporting for work at Lear on November 27, 2012. [DE 98-16 at 6] Thereafter, Lear again informed him on multiple occasions that it could still accommodate his work restrictions [98-14 at 3-5, 7] but he did not report.[6]

In response to the instant summary judgment, Scott has produced no evidence that either Lear or the Union failed to accommodate his purported disability.[7] The union steward could not have "allowed" Lear to discriminate against Scott in the absence of a showing of discrimination altogether. Accordingly, Scott's ADA claim against the Union fails.

---

[6] On December 3, 2012, another physician placed Scott on additional restrictions limiting him to no overhead work and no lifting over 10 pounds with his right arm. [DE 98-14 at 8] These restrictions were to be in place for six weeks. *Id.* Despite multiple requests for documentation in December 2012, Lear did not receive notice of these restrictions until about April 19, 2013 [DE 98-16 at 6-7], and regardless, Scott has provided no evidence to suggest that he would have been unable to perform the very same work Lear assigned him to in November 2012 under these new, temporary work restrictions.

[7] The Court need not address the issue of whether the Union *can* be held liable for any alleged disability discrimination at the hand of Scott's employer when he has provided no evidence of any such discrimination in the first place.

### d. Scott's Retaliation Claim Fails

Scott's Title VII retaliation claim embodies a claim for breach of the duty of fair representation; essentially, he argues that the Union retaliated against him by failing to process his purported grievances. The Union's duty of fair representation and Title VII overlap in that they both prohibit discrimination. *Young-Smith v. Bayer Health Care, LLC*, 788 F. Supp. 2d 792, 802 (N.D. Ind. 2011) (citing *Agosto v. Correctional Officers Benev. Ass'n,* 107 F. Supp. 2d 294, 304 (S.D.N.Y. 2000)). Consequently, where a plaintiff claims that a union violated Title VII based on its failure to represent a member, courts generally incorporate the duty of fair representation as one of the elements of the alleged Title VII violation. *Id.* (citing *Agosto*, 107 F. Supp. 2d at 304 (collecting cases)). "Once the plaintiff establishes a breach of the duty of fair representation, she must demonstrate that the adverse action was motivated by unlawful discrimination or retaliation." *Id.* (citing *Burke v. CWA Local 1109,* 2009 WL 3805517, *3 (E.D.N.Y. 2009)).

To establish a Title VII claim against a union based on a breach of a duty of fair representation, Scott must show that: (1) Lear violated the collective bargaining agreement with respect to the Scott; (2) the Union permitted the breach to go unrepaired, thus breaching its own duty of fair representation; and, (3) there was some indication that the Union's inactions were motivated by animus. *Armour v. Indep. Limestone Co.*, No. IP99-898-C-T/G, 2000 WL 1701962, at *2 (S.D. Ind. Mar. 16, 2000) (citing *Greenslade v. Chicago Sun Times Inc.*, 112 F.3d 853, 866 (7th Cir. 1997); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 868 (7th Cir. 1985)). "A union's refusal to handle a grievance on the basis of discriminatory animus violates the duty of fair representation." *Armour*, 2000 WL 1701962, at *2 (citing *Greenslade*, 112 F.3d at 867; *Martin v. Youngstown Sheet & Tube Co.*, 911 F.2d 1239, 1248 (7th Cir.1990)). The need to show animus

in the retaliation context translates to the requirement that a plaintiff show a causal connection between his protected activity and the discriminatory action. *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001). To show a causal connection, Scott must produce some evidence that the defendant "would not have taken the adverse … action but for [his] protected activity." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (internal quotations and citations omitted).

Scott claims that, between December 2010 and December 2011, he observed or experienced various issues with sexual harassment, sex discrimination, general harassment from supervisors and coworkers, vacation days, wages, worker's compensation claims, leaked information, and issues of whether his assigned jobs complied with injury-related work restrictions. By his own admission, however, he never asked the Union to file grievances over the purported harassment from his supervisors and coworkers, female employees receiving preferential treatment, or his placement on a light duty job. [DE 98-15 at 76:16-22, 92:18-93:13, 98:3-9]. When he *did* ask the Union for help, Union officials responded in the affirmative and persuaded Lear to credit him with a vacation day, lobbied for and obtained 6.5 hours of unpaid work for Scott, and had his worker's compensation medical appointments rescheduled to accommodate him. [DE 98-7 ¶¶ 19-21]

Because he felt the Union failed to prosecute the grievances he never asked to be filed, Scott: (1) wrote a letter to former International Union President Bob King complaining about a lack of proper assistance from Local 2335; and (2) filed a NLRB unfair labor practice charge against the Union alleging it breached its duty of fair representation by failing to process his grievances. [DE 98-7 ¶ 22; 98-11 at 1; 98-15 at 89:11-25, 106:5-107:3; 98-16 at 2-4]. Scott

claims that, in response to these two purportedly protected actions, the Union sat back and did nothing to address his various problems with Lear.

This retaliation claim fails for several reasons. First, in response to the instant summary judgment, Scott has provided no evidence indicating that Lear breached the CBA as applied to him during his employment. And, without such a showing, he cannot claim that the Union subsequently failed to fairly represent his grievances against Lear. Second, the NLRB dismissed Scott's charge for failing to show that the Union refused to process his grievances for any unlawful reasons. [DE 98-11 at 2] Likewise here, Scott does not and cannot identify which grievances the Union failed to prosecute, because by his own admission, he never asked the Union to file the grievances in the first place.[8] [DE 98-15 at 76:16-22, 92:18-93:13, 98:3-9] It comes as no surprise that his appeal of the NLRB dismissal subsequently fell short because "the investigation revealed the Union looked into and resolved several of [his] complaints, including a paycheck shortage and a dispute over a vacation day." [DE 98-11 at 5] Third, Scott has provided no evidence suggesting a causal nexus between his January 2012 complaints and the Union's alleged inaction. Therefore, no reasonable factfinder could determine that genuine issues of material fact exist as to whether the Union retaliated against Scott in violation of Title VII. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) (affirming summary judgment where plaintiff provided no evidence, circumstantial or otherwise, linking his termination to EEOC filing).

---

[8] Even if Scott had pointed to the grievance he claimed to have requested after being sexually harassed by a female coworker as an example of the Union's failure to prosecute his claims, his retaliation claim would still fall well short based on his failure to show that Lear breached the CBA and that the Union declined to pursue his sexual harassment grievance because of his letter and NLRB filing.

### e. Scott's Fair Representation Claims Fail

Scott's complaint only alleges a fair representation cause of action against the Union with respect to his termination from Lear. [DE 1] However, in his deposition, Scott raised several other instances between December 2010 and December 2011 (noted above) for which he requested assistance from the Union, but contends he did not receive proper representation. To the extent he intended to raise fair representation claims based on these matters, such claims are untimely. A six-month statute of limitations governs claims against labor organizations for breach of the duty of fair representation. 29 U.S.C. § 160(b). Where such a claim is based upon the failure of a union, after being notified of the employee's grievance, to take action to process grievances or initiate grievance procedures, the six-month period begins to run when the employee discovers, or through reasonable diligence should have discovered, the acts constituting the violation. *Metz v. Tootsie Roll Indus., Inc.*, 715 F.2d 299, 303-04 (7th Cir. 1983).

The most generous application of this statute of limitations starts the six-month filing clock on April 23, 2013, when Lear terminated Scott. Scott testified that, by that date, he realized his various requests to the Union for assistance had run their course. [DE 98-15, 120:21-122:17] However, Scott filed the instant complaint on April 4, 2014, well beyond six months after his termination. Therefore, apart from his claim that the Union failed to represent him in relation to his firing, any additional failure of representation claims are time barred.

Regarding Scott's contention that the Union failed to represent him in connection with his termination from Lear, this claim also fails because, based on the evidence properly before this Court, no reasonable factfinder could determine that any union official acted arbitrarily or with improper motive. A union breaches its duty of fair representation where it acts in an arbitrary or discriminatory manner, or in bad faith. *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499

U.S. 65, 67 (1991). "Whether or not a union's actions are discriminatory or in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003). In addition, a union's actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *Id.* (internal citations omitted). This "extremely deferential standard" precludes the courts from "substitut[ing] their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992). Moreover, "mere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." *United Steelworkers of America v. Rawson*, 495 U.S. 362, 372-73, 110 S. Ct. 1904, 1911, 109 L. Ed. 2d 362 (1990).

The Union did not "skip over" the applicable steps in Scott's grievance process, as he maintains. [DE 98-15 at 159] The day after Lear fired Scott, Union representative Lee Lynk filed a grievance on his behalf challenging the termination and seeking to make Scott whole. [DE 98-12] Local union officials advocated for Scott's position at the Step 2 grievance meeting on August 7, 2013, but Lear denied the grievance at that stage. [DE 98-7 ¶ 28] International *and* local union officials then advocated for Scott's reinstatement at the Step 3 meeting on August 27, 2013, but again Lear denied the grievance. [DE 98-1 ¶¶ 27, 29] The CBA does not include grievants among those permitted to participate in these meetings. [DE 98-2 at 7-8; 98-7 ¶ 13] Based on Lear's multiple denials of Scott's grievance and in the interest of expediting his process, the Union opted to submit his claim to binding mediation rather than proceeding with a Step 3 and ½ meeting. [DE 98-1 ¶¶ 30-31] The Union also elected to submit the grievance to

16

binding mediation, as opposed to arbitration, in the interest of efficiency, past practices, and a successful track record of engaging in binding mediation with Lear. *Id.* ¶¶ 32-33. The Union sent Scott advance notice of the mediation and he prepared for that binding mediation along with Union officials. *Id.* ¶¶ 34-35. The mediation took place on March 17, 2014, and the mediator ruled against Scott. *Id.* ¶ 39. Still, the Union managed to negotiate a modest settlement offer for Scott, which he rejected. *Id.* ¶¶ 41-43.

Nothing in the record indicates that the Union's actions were arbitrary, discriminatory, or made in bad faith. Thus, no reasonable factfinder could determine that genuine issues of material fact exist such to prevent summary judgment on Scott's representation claims.

## CONCLUSION

For the reasons stated above, the Court hereby **GRANTS** the Union's Motion to Strike [DE 104] and **ORDERS** that Scott's Response to defendant's Motion for Summary Judgment [DE 103] be **STRICKEN**. In addition, the Court hereby **GRANTS** the Union's Motion for Summary Judgment [DE 96]. As this order disposes of all of Scott's claims, the Clerk is **DIRECTED** to enter judgment.

SO ORDERED.

ENTERED: October 31, 2017

                                                /s/ JON E. DEGUILIO
                                                Judge
                                                United States District Court